**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**Industrial Tower and Wireless, LLC**

      **v.**                               Case No. 07-cv-399-PB
                                                  Opinion No. 2009 DNH 127

**Town of East Kingston, NH**

**MEMORANDUM AND ORDER**

Industrial Tower and Wireless, LLC ("ITW") alleges that the East Kingston Zoning Board of Adjustment ("ZBA") improperly denied ITW's application for a variance to construct a wireless telecommunications tower on property zoned only for residential use.  Before the court are cross-motions for summary judgment with respect to Count I of ITW's two-count complaint.  Count I alleges that the ZBA's ruling violates the Telecommunications Act of 1996 ("TCA") because it is not supported by substantial evidence.  See 47 U.S.C. § 332(c)(7)(B)(iii).  ITW also alleges in its summary judgment motion that the ZBA violated New Hampshire's Right-to-Know law because it failed to deliberate in public when it adopted the written decision memorializing its ruling.  For the reasons given below, I conclude that the April 23, 2009 written decision is supported by substantial evidence.

I also reject ITW's Right-to-Know law claim.  Accordingly, I deny
ITW's motion for summary judgment on Count I and grant East
Kingston and Kenridge Farm's corresponding motion.


I.   **BACKGROUND** [1]

A.   **East Kingston Zoning Requirements and New Hampshire
     Land Use Variance Law**

East Kingston's Zoning Ordinance prohibits the construction
of wireless towers in residential districts without a variance.
Zoning Ordinance of East Kingston, Art. XV(D)(2).  The Ordinance
only permits construction of new wireless telecommunications
towers in "Light Industrial" and "Commercial" zoning districts.
The Ordinance specifies that one of its goals is to "[r]educe
adverse impacts such facilities may create, including, but not
limited to: impacts on aesthetics, environmentally sensitive
areas, historically significant locations, flight corridors,
health and safety by injurious accidents to person and property,
and prosperity through protection of property values."  Art.
XV(B)(2).  The Ordinance further seeks to "[p]ermit the
construction of new towers only where all other reasonable
opportunities have been exhausted, and to encourage the users of

---

[1] Citations are to the Certified Record "CR" submitted by the
Town of East Kingston.

towers and antennas to configure them in a way that minimizes the adverse visual impact of the towers and antennas."  Art. XV(B)(4).

A New Hampshire zoning board may authorize a land use variance if the applicant proves that the following conditions are met: (1) the variance will not be contrary to the public interest; (2) special conditions exist such that literal enforcement of the ordinance results in unnecessary hardship; (3) the variance is consistent with the spirit of the ordinance; (4) substantial justice is done; and (5) the variance will not diminish the value of surrounding properties.  See N.H. Rev. Stat. Ann. § 674:33, I(b) as amended by New Hampshire Laws Ch. 307; Simplex Techs., Inc. v. Town of Newington, 145 N.H. 727, 729, 766 A.2d 713, 715 (2001).  The New Hampshire Supreme Court has explained that unnecessary hardship may be established

> by proof that: (1) a zoning restriction as applied to
> [an applicant's] property interferes with their
> reasonable use of the property, considering the unique
> setting of the property in its environment; (2) no fair
> and substantial relationship exists between the general
> purposes of the zoning ordinance and the specific
> restriction on the property; and (3) the variance would
> not injure the public or private rights of others.

Simplex, 145 N.H. at 731-32, 766 A.2d at 717.

-3-

**B.**   **ITW's Application and ZBA Hearings**

ITW, a business owning and operating antenna towers and other wireless telecommunications facilities, determined that there was a significant gap in the personal wireless service network in the northeastern section of East Kingston ("the Town"), particularly in the Route 108 area, and an antenna facility needed to be installed to close this coverage gap. Because the northeastern portion of the Town contains no land that is commercially or industrially zoned, ITW determined that there were no sites in the Town which would close the personal wireless service coverage gap without a variance.

On April 26, 2006, ITW and its co-applicant Cingular Wireless submitted an application for a variance to construct a 180-foot wireless telecommunications monopole tower and equipment area at 36 Giles Road, a 26-acre parcel of land owned by Jeffrey and Susan Marston and located in a residential zone in East Kingston.  (CR 2-78.)  The Marston property is heavily forested with the exception of utility and railroad easements that run through it.  ITW proposed construction of the tower near the peak of a hill on the Marston property.  On May 25, 2006, the ZBA held a public hearing and voted to grant ITW a variance.  (CR 79.) Thereafter, Kenridge Farm, an abutter and an intervenor in these

-4-

proceedings, unsuccessfully sought a rehearing on the ZBA's decision.  (CR 80.)  The parties then discovered that another abutter had not been properly notified of the May hearing and stipulated that the matter would be remanded to the ZBA for a new hearing. (Pl.'s Mot. for Summ. J., Doc. No. 9-2, at 7.)

On December 19, 2006, the ZBA held a *de novo* hearing and again voted to grant ITW a variance.  (CR 81, 136-48.)  In early 2007, however, Kenridge Farm applied for and was granted a rehearing of the ZBA's decision.  (CR 82, 85-118.)  By this time, ITW had agreed to reduce the height of the proposed tower from 180 feet to 160 feet.  (CR 85.)  On April 26, 2007, the ZBA began the rehearing process for a 160-foot tower with a public hearing and selected Mark Hutchins, an independent radio-frequency engineer, to be a consultant to the ZBA.  (CR 156-163.)  The ZBA also scheduled a balloon test to gauge the likely visual impact of the proposed 160-foot tower.  Id.

The balloon test was conducted on May 5, 2007, a clear but somewhat cloudy day with occasional winds, using a tether that made the 3-foot diameter red balloon 170 feet high. (CR 164, 167.)  The ZBA report on the balloon test and photos taken during the test indicate that the balloon was barely visible from some locations, but was visible from Kenridge Farm's driveway and the

rear of the house, as well as from other locations in the area
including, *inter alia*, along Giles Road, Joslin Road, Stumpfield
Road, and parts of Route 108 in the Town.  (CR 164, 222-61.)
Following the balloon test, the ZBA received correspondence from
the Public Archaeology Lab ("PAL"), and the New Hampshire
Division of Historical Resources ("NHDHR") indicating opposition
to ITW's proposed tower because of its adverse effect on the
integrity of historical properties in the area, including
Kenridge Farm and the Maurice Kimball House in Kensington.  NHDHR
said that balloon test confirmed that "the proposed installation
would create a significant intrusion in the rural scenic backdrop
and important public views of two significant historic
buildings."  (CR 577.)  Later during the hearing process when a
new tower height and site on the Marston property were proposed,
the ZBA decided that there was too much foliage to conduct a new
balloon test but that it could extrapolate the information from
the May 5, 2007 balloon test when making its determination for
the new site. (CR 189.)

     On May 14, 2007, Kenridge Farm submitted a report by David
Maxson of Broadcast Signal Lab that analyzed and critiqued ITW's
variance application from an RF engineering perspective.  (CR
888.)  Maxson stated that the coverage ITW sought from the

-6-

proposed tower fell predominantly in the neighboring town of
Exeter, as well as in Kensington, and would not adequately
address areas within the borders of East Kingston.  (CR 890.)
Maxson further stated that propagation studies he had performed
demonstrated the efficacy of alternative approaches to remedy the
Town's coverage gap.  (CR 895-898.)  Maxson asserted that
existing structures could be used to affix antennas and provide
wireless service to the area.  (CR 892-93.)  Even if existing
structures would not be sufficient, Maxson proposed that lower,
alternative tower structures such as faux silos containing
antennas and placed next to barns might be utilized to better
meet the Town Ordinance. (CR 893-94.)

     As the rehearing process continued, the ZBA received the
Hutchins report as well as additional correspondence from
Hutchins detailing his analysis of ITW's application.  The
Hutchins report concluded that: Cingular has a gap in service in
the Town that cannot be filled using existing facility sites;
other providers likely have poor service in the Town and ITW's
proposed tower could provide for collocation of provider
antennas; and "one or more facilities must be placed in
residential/agricultural/forestry zones to adequately serve the
town" because the Town's coverage gap cannot be filled from

towers in the Commercial and/or Light Industrial zones.  (CR 272, 280.)  Further, the Hutchins report noted that the proposed tower would still provide "inadequate service of the southeast section of the Town."  (CR 272.)

The Hutchins report also discussed the possibility of stealth treatments, for example moving the tower down the hill on the Marston property and using a tree or "stick" design. (CR 280.)  The report noted that Cingular had submitted an explanation of why small-scale facilities such as distributed antenna systems ("DAS") cannot address the coverage gaps, but found that this explanation raised issues regarding deployment logistics and financial burden of such a system that were beyond the scope of Hutchins' analysis.  (CR 281.)  The Hutchins report concluded that ITW had not demonstrated that a 160-foot structure is necessary and noted that Cingular's engineer stated that 120 feet is the minimum required at the proposed site and 140 feet is ideal.  (CR 281.)  The Hutchins report further noted that although it may create problems for collocation of other providers, "use of the Bodwell silo off North Road would provide coverage over much of the problem area, as would a facility as suggested at Giles Hill."  (CR 282.)

At its June 29, 2007 meeting, the ZBA focused on the alternatives sought by ITW before applying for the variance, and how exhaustive that research was.  (CR 170.)  Maxson stated that there are alternatives to provide coverage for the Route 107/108 area, such as rooftop, silo, and flagpole facilities.  (CR 171.) Hutchins also discussed alternative sites including a flagpole-designed structure at the Hillside Cemetery, Giles Hill, the Bodwell silo, and a flagpole design at the school on South Road. (CR 172.)  The ZBA suggested the alternative of moving the proposed tower to the west on the Marston's property, lowering the height of the tower, and disguising it as a tree.  (CR 172.) The possibility of a multi-site alternative was also discussed. (CR 172.)  Further, members of the public apprised the ZBA of several individuals who had expressed interest in having ITW place an antenna on their property.  (CR 173.)

Representatives of ITW addressed these proposed alternatives at the June 29 and July 24, 2007 ZBA meetings and  dismissed them as "scenarios and not concrete options." (CR 174.)  Don Cody, Director of Operations for Industrial Wireless, stated that a multi-site alternative would be cost-prohibitive.  (CR 172.) ITW's site acquisition specialist, John Champ, noted that he had looked at the largest pieces of property that would meet setback

issues when searching for suitable sites. (CR 172.)  Champ also
noted that the Bodwells were not interested in considering any
proposal from ITW.  (CR 172.)  He stated that the Monahan Corners
site proposed by Maxson is not suitable because it is too small
for a 10,000 square foot compound area and did not meet setback
requirements.  (CR 178.)  Further, Champ noted that ITW had sent
a letter to the owner of record for the Giles Hill location but
had received no response. (CR 172.)  Likewise, ITW received no
response from letters it sent to owners of the Sullivan
properties in the neighboring town of Kensington.  (CR 178.)
Champ also stated that alternatives on Morse Hill and in the
commercial and light industrial zone would not meet coverage
needs.  (CR 178.)

     Champ and Cody both noted that they had investigated the
possibility of moving the proposed tower site to a different
location on the same property approximately 700 feet down the
hill, but the Marstons had indicated a potential other use for
that site and would not agree to a new lease for that site.  (CR
172, 178.)  Barry Hobbins, another ITW representative, stated
that a statute prohibited any new construction on or about a
cemetery of burial grounds, which would rule out the Hillside
Cemetery as an alternative site.  (CR 178.)  Hobbins reiterated

that ITW had provided a report demonstrating its due diligence in investigating 800 possible sites and had contacted all the alternative sites suggested by Maxson and Hutchins.  (CR 178.) Finally, when queried regarding whether ITW had researched the possibility of placing alternatives to a monopole and a 10,000 square foot compound at any of the alternative sites, Cody stated that the ZBA was "digressing from the issue."  (CR 180.)

At the August 23, 2007 hearing, an ITW representative advised the ZBA that the applicants had agreed to both relocate the tower from its original proposed location to a new location on the Marston's property 235 feet off the ridge and lower the tower height to 140 feet.  (CR 191.)  ITW also stated that it was willing to implement a "mono-pine" stealth installation if the ZBA so desired it.  (Id.)  ITW asserted that this alternative location and lower height would lessen the amount of the tower that could be seen above the ridge by fifteen feet.  (Id.) Jeffrey Spear, Attorney for Monique Waldron and Kenridge Farm, stated that the tower would still protrude eighty feet above the tree line, and by his interpretation of the topographical maps would only be six feet lower than the original location, rather than fifteen feet lower as asserted by ITW.  (CR 192.)  Spear also emphasized that the burden was on ITW to show that it had considered and eliminated all the alternatives for tall towers. (CR 194.)  Further, Spear drew the ZBA's attention to the fact

-11-

that the letters sent by the applicants only targeted property
capable of accommodating a 180-foot tower and only solicited
interest in constructing a tower.  (CR 194-95.)  The applicant's
letters do not address the possibility of constructing
alternatives to a tall tower.  (CR 194.)

In response to questions about alternatives, Cody stated
that a tower that extended only ten feet above the tree line
would be cost-prohibitive and impractical because it could
require twenty-four sites to solve the coverage problem and would
not allow for co-location.  (CR 194.)  In response to the
possibility of building a 100-foot silo with multiple antennas,
Cody stated that ITW had not asked anyone to build a silo on
their property and that ITW does not offer people a "catalog" of
options when sending letters to solicit sites for facility
placement.  (CR 195.)  Cody also stated that existing silos are
incapable of handling the load and that the cost factor makes
construction of new stealth silos prohibitive.  (Id.)

On September 27, 2007, the ZBA met to deliberate and voted
to deny ITW's variance application because: (1) the residential
use restriction did not interfere with the applicant's reasonable
use of the property; and (2) the proposed use would be contrary
to the spirit and intent of the zoning ordinance.  (CR 203-16.)
On October 3, 2007, the ZBA issued a terse written notice of its
decision, which stated that it had voted to deny ITW's variance

application for construction of a 160-foot monopole and equipment area in a residential zone.  (CR 83.)

On October 25, 2007, ITW, accompanied by Cingular Wireless and the Marstons, moved for a rehearing.  (CR 119-25.)  On November 13, 2007, the ZBA voted to deny ITW's request for a rehearing, (CR 219-21), and later issued a brief written notice memorializing its decision.  (CR 84.)

C.   **Procedural Background**

On December 13, 2007, ITW commenced this action in a two-count complaint, alleging that (1) the ZBA's denial violated the TCA in that it was not set forth in a separate written decision and that the denial was not supported by substantial evidence contained in a written record; and (2) the Town's zoning ordinance, as applied by the ZBA, has the effect of prohibiting ITW and its lessees from providing personal wireless service to its customers. (Cmplt., Doc. No. 1).

On April 30, 2008, ITW moved for summary judgment with respect to Count I of its Complaint.  The Town objected to this motion.  I then granted leave for Kenridge Farms to intervene, and the Town and Kenridge Farms filed their own cross-motions for summary judgment with respect to Count I.  On March 25, 2009, I ruled that the Town had violated the first prong of the "substantial evidence" test contained in the TCA because it failed to issue a separate written decision providing the

-13-

rationales for its denial.  I then remanded the matter to give the Town thirty days to cure this defect by issuing a new written decision.  (Memorandum and Order, Doc. No. 29).

On March 26, 2009, the ZBA met and decided that the ZBA's chair and its attorney, Peter Loughlin, would draft a decision for the ZBA to approve and finalize.  On April 23, 2009, the ZBA met in a "working meeting", circulated a written decision to its members, and voted unanimously to adopt the written decision denying ITW's application.  In the April 23, 2009 written decision, the ZBA cites the two rationales that it voted on September 27, 2007 as not being satisfied.  First, the decision states that an unnecessary hardship did not exist because the Town Ordinance does not unreasonably interfere with ITW's use of the property considering the unique setting of the property.  To support this rationale, the decision states that "other proposed alternatives to the specific tower presented" might be feasible. (April 23, 2009 Decision at 6, Doc. No. 30).  The decision notes that ITW failed to persuade the ZBA that alternative sites for the proposed tower and alternative forms of technology were not feasible and would not achieve the same general coverage goals. Second, the decision states that granting a variance would not be consistent with the spirit of the Ordinance.  To support this rationale, the decision states that the proposed facility would

have an "adverse impact on aesthetics, environmentally sensitive areas and historically significant locations."  (Id. at 8.)

Following the filing of this written decision with the court, the parties filed supplemental memoranda to their cross motions for summary judgment addressing whether the April 23, 2009 written decision is supported by substantial evidence.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A party seeking summary judgment must first identify the absence of any genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The evidence submitted in support of the motion for summary judgment must be considered in the light most favorable to the nonmoving party, indulging all reasonable inferences in its favor.  See Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001).  The burden then shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot product such evidence, the motion must be granted." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996); see Celotex,

-15-

477 U.S. at 323.  On cross motions for summary judgment, the
standard or review is applied to each motion separately.  See Am.
Home Assurance Co. v. AGM Marine Contractors, Inc., 467 F.3d 810,
812 (1st Cir. 2006).

A claim alleging a lack of substantial evidence for a zoning
decision in violation of the TCA is especially amenable to
decision at summary judgment because the court's only role is to
determine if substantial evidence exists within the
administrative record that would support the zoning decision.
See Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals, 297
F.3d 14, 22 (1st Cir. 2002); see also 47 U.S.C. § 332(c)(7)(B)
(iii).  The First Circuit has instructed that the TCA's
substantial evidence standard, though "highly deferential, is not
a rubber stamp."  Sw. Bell Mobile Sys., Inc. v. Todd, 244 F.3d
51, 58-59 (1st Cir. 2001)(citation omitted); see also Town of
Amherst v. Omnipoint Commc'ns Enters., Inc., 173 F.3d 9, 16 (1st
Cir. 1999) ("The substantial evidence test . . . involves some
deference but also has some bite.").  Substantial evidence "does
not mean a large or considerable amount of evidence," or even a
preponderance of the evidence, just "more than a scintilla of
evidence."  ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94-
95 (1st Cir. 2002)(internal quotation marks and citations
omitted).  Substantial evidence is simply

> such relevant evidence as a reasonable mind might
> accept as adequate to support a conclusion.  The

-16-

> reviewing court must take into account contradictory
> evidence in the record.  But the possibility of drawing
> two inconsistent conclusions from the evidence does not
> prevent an administrative agency's finding from being
> supported by substantial evidence.

Todd, 244 F.3d at 58 (quoting Penobscot Air Servs., Ltd. v. Fed.

Aviation Admin., 164 F.3d 713, 718 (1st Cir. 1999)).

The substantial evidence standard does not permit a court to

"uphold a board's denial of a permit on grounds that it did not

present in the written decision."  Nat'l Tower, 297 F.3d at 22.

Judicial review of a board's decision, however, is not limited

"only to the facts specifically offered in the written decision."

Todd, 244 F.3d at 60.  A reviewing court can rely on evidence

from the written record supporting the board's stated reasons for

its decision, even if the board itself did not.  See id.; see

also Second Generation Props., L.P. v. Town of Pelham, 313 F.3d

620, 627 (1st Cir. 2002) ("an instance in which the district

court reviewed the record developed by the Board and provided

more detail than did the Board in its decision . . . is entirely

in accordance with the [TCA]").


### III.  ANALYSIS

#### A.  The Variance

A New Hampshire zoning board may authorize a land use

variance if the applicant proves that the following conditions

have been met: (1) the variance will not be contrary to the

public interest; (2) special conditions exist such that literal enforcement of the ordinance results in unnecessary hardship; (3) the variance is consistent with the spirit of the ordinance; (4) substantial justice is done; and (5) the variance will not diminish the value of surrounding properties.  See N.H. Rev. Stat. Ann. § 674:33, I(b); Simplex, 145 N.H. at 729.  In its written decision, the ZBA found that ITW had failed to establish: (1) that special conditions exist such that a literal enforcement of the provisions of the ordinance would result in unnecessary hardship; and (2) that granting the variance would be consistent with the spirit of the ordinance.  ITW argues that neither finding is supported by substantial evidence.  I address each ground for the ZBA's decision in turn.

    1.   Unnecessary Hardship

To prove unnecessary hardship in a typical case, an applicant must establish, among other things, that the "zoning restriction as applied to [the applicant's] property interferes with their reasonable use of the property, considering the unique setting of the property in its environment."  Simplex, 145 N.H. at 731-32.  The New Hampshire Supreme Court recently explained that uniqueness in cell tower cases also must be construed to accommodate the TCA's effective prohibition provision.[2]  Daniels

_____

[2] Under the TCA, local land use law is preempted when the decision of a local board would effectively prohibit the provision of wireless services.  47 U.S.C. § 332(c)(7)(B)(i)(II).

v. Town of Londonderry, 157 N.H. 519, 527, 953 A.2d 406, 412
(2008).  Thus, the court has recognized that a property may be
deemed unique if it is especially well suited to close a
significant gap in wireless coverage.  Id.  Accordingly, the
court has held that:

> [t]he fact that a proposed location is centrally
> located within the gap, has the correct topography, or
> is of an adequate size to effectively limit the gap in
> coverage, are factors that may make it unique under the
> umbrella of the TCA.  Similarly, that there are no
> feasible alternatives to the proposed site may also
> make it unique.

Id.

The ZBA determined in its April 23, 2009 decision that ITW
had failed to prove uniqueness because it did not establish that
other alternatives to its proposal were not feasible.  In
particular, the ZBA identified two alternatives that it claimed
ITW failed to adequately explore.  First, the ZBA concluded that
ITW had not provided a sufficient explanation as to why moving
the tower west of the proposed site off the ridgeline, lowering
the tower to the height of the tree canopy, and disguising the
tower as a tree was not a feasible alternative.  Second, the ZBA
determined that ITW had only considered tall towers in its site
search and had dismissed properties not capable of accommodating

---

The First Circuit has determined that a local board's denial of a
cell tower application violates the TCA's effective prohibition
clause when the application is "the only feasible plan" to fill a
"significant geographic gap in service."  Second Generation, 313
F.3d at 630-31.

extremely tall monopole towers and 10,000 square foot compounds.
In particular, the ZBA concluded that ITW had not sufficiently
considered alternatives to tall towers, including stealth
installations such as a faux silo and multiple-site solutions.

ITW challenges the ZBA's decision on several grounds.
First, ITW argues that the Town has not identified any specific
feasible alternatives, but has merely relied on speculation
regarding the availability of alternative sites.  ITW argues that
speculation about possible alternatives cannot qualify as
substantial evidence that alternatives actually exist, and thus
cannot properly be relied upon as a basis for denial.  Neither
the TCA nor New Hampshire variance law, however, places any
burden on the ZBA to present specific evidence that other
acceptable sites were available to ITW.  Instead, the burden was
on ITW to provide evidence demonstrating that the land was unique
in that no feasible alternatives existed for its proposed tower.
See N.H. Rev. Stat. Ann. § 674:33, I(b); Todd, 244 F.3d at 63
(describing the burden of proof under the TCA); Nine A, LLC v.
Town of Chesterfield, 157 N.H. 361, 950 A.2d 197 (N.H.
2008)(stating that the applicant bears the burden of proof in
order to obtain a variance under RSA § 674:33).  Here, the ZBA
rejected ITW's application for a variance in part because ITW had
failed to meet its burden of proof with respect to the issue of
uniqueness.  The ZBA does not need to point to a specific

-20-

alternative site to be entitled to reject a variance application on this basis as long as it can point to plausible alternatives that ITW failed to properly evaluate.

ITW next contends that a tower on the Marston's property that does not extend above the ridgeline is not a feasible alternative because it would not provide coverage to the area of the Town on the other side of the ridge, which includes the section of 108 in the Town along the Kensington boundary.  While it is undisputed that a tower that does not extend above the ridgeline by itself would not close the section of the Town's wireless gap on Route 108 along the Kensington boundary, that does not mean that the ZBA could not reasonably conclude that the alternative was feasible.

This court has recently held that "a facility at an alternative site can be 'feasible to serve [a provider's] customers' [for purposes of the TCA] even if it does not close an identified coverage gap all, or even most of, the way that a facility at the provider's proposed site would."  Industrial Tower and Wireless, LLC v. Town of Epping, 2009 DNH 121, at 15 (D.N.H. Aug. 11, 2009) (LaPlante, J.).  This is because, although local zoning boards cannot effectively prohibit wireless services, cost-benefit analyses regarding the impact of a proposed facility "are in the realm of trade-offs" and "such choices are just what Congress has reserved to the town."

Omnipoint, 173 F.3d at 15.  In other words, while a town cannot preclude wireless service altogether, it can balance the effectiveness of a wireless system against the other impacts the system will have on the town.  Id.  Given the evidence in the record, including statements by Hutchins that even ITW's proposed tower would not cover all the gaps in the Town's service, it was reasonable for the ZBA to conclude that a tower that does not extend above the ridgeline was a feasible alternative because it would still provide coverage to a large portion of the Town's coverage gap while reducing the visual impact of the tower.

The ZBA also pointed to other feasible alternatives to support its denial of ITW's application.  The ZBA heard evidence from experts such as Hutchins and Maxson that a number of alternatives exist to close a large portion of the wireless coverage gap in the Town.  These alternatives include multiple sites with shorter installations as opposed to a single tall tower and stealth installations.

ITW claims that it has demonstrated that all the alternatives suggested by the ZBA are not feasible for various reasons including, *inter alia*, lack of interest by property owners, inability of alternative sites to accommodate the proposed tower and facility, and poor location of the alternative sites for closing the coverage gap.  And ITW is correct that there is undisputed evidence in the record that some of the

-22-

proposed solutions such as co-location on an existing tower, antenna installation on other currently existing structures such as an existing silo in the Town, and construction in a cemetery in the Town are not feasible alternatives.  ITW has not adequately demonstrated, however, why other proposed solutions such as a stealth faux silo installation or multiple shorter installations would not be feasible alternatives.

ITW contends that a multiple site solution would not be feasible because multiple towers would be cost-prohibitive and multiple sites are not available to close the Town's wireless gap.  But ITW provided no evidence to support its contention that this solution would be cost-prohibitive, and the ZBA is not required to approve the most economical proposal.  "[D]evelopers of wireless networks are not entitled to locate facilities wherever they wish to, nor are local governments required to approve the 'best' or most economical siting proposals, so long as permit denials are given in writing and are supported by substantial evidence in the record." ATC Realty, LLC v. Town of Sutton, 2002 DNH 057, 2002 WL 467132, at *11 (D.N.H. Mar. 7, 2002) (citing Omnipoint, 173 F.3d at 14-15).

Further, ITW's contention that multiple sites are not available is based on the fact that it considered and rejected over 800 alternative sites, including the alternative sites identified by the ZBA, Hutchins, and Maxson.  However, the

efficacy of ITW's search for other feasible alternatives was
drawn into doubt by evidence in the record.  Although ITW
produced evidence that it had contacted the owners of all
properties suitable to accommodate tall towers and 10,000 square
foot compounds and only the Marstons had expressed interest in
ITW's proposal, ITW's site search focused on a singular tall
tower installation.  The search did not include properties able
to accommodate smaller facilities.

In addition, ITW's search only evaluated property owners'
willingness to allow towers on their property.  It did not
evaluate whether property owners were willing to allow stealth
wireless installations such as a faux silo on their property.
The minutes of the August 23, 2007 ZBA meeting reflect that in
response to a question from a ZBA member about faux silos as an
alternative, an ITW representative stated that ITW had not asked
property owners about building a faux silo. (CR 195.)  He
contended that ITW was not obligated to offer people a "catalog"
of options.  Further, he stated that he was unsure that a faux
silo would have any less of a visual impact on the area and ruled
the option out as cost-prohibitive.  (Id.)  These conclusory
statements regarding the visual impact and the cost prohibitive
nature of a faux silo, however, are not sufficient to show that a
faux silo is not a feasible alternative and the ZBA was entitled
to reject these unsupported statements.  See ATC Realty, LLC v.

Town of Sutton, 2002 WL 467132, at *11 (noting that local governments are not required to approve the most economical proposal).  Given the evidence in the record, it was not unreasonable for the ZBA to conclude that the use of faux silos is a feasible alternative and that ITW failed to demonstrate that it had adequately considered such an alternative.

In sum, the ZBA's denial was based on the fact that ITW was focused on the use of tall towers, and did not fully explore alternative stealth installations or multiple site solutions. While pure speculation about other options that might exist cannot justify denial of the application under either federal or state law, ITW must prove uniqueness by demonstrating that it made a full effort to evaluate alternatives and that alternatives are not feasible to serve its customers.  There was credible evidence before the board that there were other feasible and preferable alternatives.  ITW's failure to explore these alternatives reasonably prevented the ZBA from concluding that ITW had demonstrated the uniqueness of its proposal.  Although the ZBA may have reasonably reached another conclusion, it was justified in concluding that ITW has not shown that a full effort has been made to evaluate all known alternatives.

2.   Spirit of the Ordinance

The ZBA also denied ITW's application on the ground that the use would be contrary to the spirit and intent of the Ordinance.

(CR 213-16.)  The primary goal of the Ordinance at issue is to preserve and protect the rural character of East Kingston by reducing the negative impacts of telecommunications facilities, such as "impacts on aesthetics, environmentally sensitive areas, [and] historically significant locations."  Zoning Ordinance of East Kingston, Art. XV(B)(2).  Accordingly, the Ordinance aims to "permit the construction of new towers only where all other reasonable opportunities have been exhausted, and to encourage the users of tower and antennas to configure them in a way that minimizes the adverse visual impact of the towers and antennas." Art. XV(B)(4).  ITW claims that the ZBA's conclusion regarding the spirit of the Ordinance is not supported by substantial evidence.  I disagree.

The ZBA concluded that ITW's proposed tower is not consistent with the spirit of the Ordinance because it would "alter the essential character of the locality and have an adverse impact on aesthetics, environmentally sensitive areas, and historically significant locations."  (April 23, 2009 Decision, at p. 8, Doc. No. 30.)  Local zoning boards may restrict development based upon aesthetic concerns, so long as those judgments do not mask a de facto prohibition of personal wireless services and those aesthetic concerns are "grounded in the specifics of the case."  Todd, 244 F.3d at 61.

-26-

In the present case, even if there were some generalized concerns expressed by members of the public regarding the aesthetics of cell towers, the ZBA did not rest its decision on such generalized concerns.  See id. at 60.  Rather, the ZBA addressed the specifics of ITW's proposal by considering the height, location, type of installation, and where the tower would be visible from when it concluded that a tower extending over the ridge of the Marstons' property was in violation of the spirit of the ordinance.  The record includes undisputed evidence that ITW proposed to construct its tower in an area of the Town that has retained its rural residential character and is prized for its views of the countryside.  Further, evidence in the record indicates that the proposed tower would extend significantly above the tree line on the ridge of the Marston's property, be of a different magnitude than any other structures in the region, and be visible from numerous locations in the rural area.

ITW contends that the ZBA's decision regarding the spirit of the Ordinance is not based on substantial evidence because the ZBA improperly relied on reports of the impact of the proposed tower on historical properties including Kenridge Farm and the Maurice Kimball House.  ITW admits that the evidence shows that its proposed wireless facility will impact some "potentially historic" properties, (Pl.'s Mem. in Opp. to Cross-Mots. for Summ. J., Doc. No. 22, at 12.), however, ITW contends that the

ZBA is precluded from considering the impact of the proposed
tower on these properties because the Ordinance was meant to
protect East Kingston and the historical properties in question
are located in a neighboring town and not in East Kingston.  Even
if the Town could not consider the proposed tower's visual impact
on property outside the Town, however, evidence indicates that
the proposed tower would also be visible from other areas of the
community and impact the rural nature of East Kingston.  Thus,
the ZBA's aesthetic concerns regarding impact on the Town remain.

     ITW next argues that concerns expressed regarding the visual
impact of its proposed tower are not grounded in the specifics of
the case because the concerns are based upon an earlier proposed
tower height of 180 feet and a balloon test using a 170-foot
tether.  ITW contends that the ZBA's decision regarding
aesthetics cannot be grounded in the specifics of the case if it
fails to consider ITW's modified proposal.  To its credit, ITW
did modify the original proposal for a 180-foot monopole to
accommodate the ZBA's desire for a less conspicuous facility.
ITW lowered the height of the tower, moved its location slightly
off of the ridge line, and agreed to use a mono-pine design.
However, as the ZBA noted, it was entitled to draw inferences
from the balloon test when considering ITW's application for a
shorter tower at the new site. (CR 189.)

Although the modifications agreed to by ITW undoubtedly would reduce the negative visual impact of ITW's proposal, there is no question that even a 140-foot tower would extend and be visible above the tree line on the ridge on the Marstons' property.  Evidence before the ZBA indicated that ITW's proposed alternative location and 140-foot height would only lessen the amount of the tower you could see above the ridge by anywhere from six to fifteen feet and that the 140-foot tower would still protrude nearly eighty feet above the tree line.  While the Marstons' property is already impacted by utility easements, those easements are of a far lesser magnitude than ITW's proposed tower, which is of a different magnitude and nature than anything else in the vicinity.  See, e.g. Todd, 244 F.3d at 61 (finding substantial evidence of adverse visual impact where residents specifically complained that the proposed tower was of a different magnitude than anything else in the vicinity and was inconsistent with the residential uses around it).

Evidence suggests that a 140-foot tower near a ridge on the Marstons' property would be prominent and aesthetically incompatible with the rural character of the area.  This evidence reflects more than "generalized concerns" about the aesthetic appeal of wireless telecommunication facilities.  See id at 60. There is no indication that the ZBA's decision based on aesthetics is a mere pretext for a blanket prohibition on cell

tower variances.  Instead, the evidence supports the view that
the ZBA reasonably concluded that the proposed tower was not
compatible with the surrounding area and not sufficiently
screened from view.

In sum, there is substantial evidence in the record to
support the conclusion that the ZBA's grounds for denial were
reasonable.  A reasonable person could find credible and
substantial evidence supporting a finding that aesthetics was a
legitimate reason for the denial.  While multiple eighty-foot
structures will not completely eliminate the aesthetic impacts of
ITW's project and might not provide the same coverage, it will
cover much of the gap and lessen the aesthetic impacts by
bringing towers down to a level consistent with surrounding trees
or disguising them as silos that fit into the rural residential
character of the area.  See PrimeCo Pers. Commc'ns, Ltd. P'Ship
v. City of Mequon, 352 F.3d 1147, 1149 (7th Cir. 2003)(Posner,
J.) (stating that a reasonable decision whether to approve a
wireless antenna requires a balance of the contribution the
antenna will make to wireless service and the aesthetic or other
harm caused by the antenna).  Substantial evidence supports a
finding that the application was denied based on aesthetic
concerns.

**B.   New Hampshire's Right-to-Know Law**

ITW also argues that the ZBA violated New Hampshire's Right-to-Know law by discussing the April 23, 2009 written decision in one or more non-public sessions.  ITW contends that this conclusion is "inescapable" because there is "no record of any public discussion of the decision at all."  (Pl.'s Supp. Mem., Doc. No. 33 at 13).  I disagree.

New Hampshire law requires land use boards to comply with RSA chapter 91-A, the State's Right-to-Know law.  See N.H. Rev. Stat. Ann. § 673:17.  Under chapter 91-A, "all meetings . . . shall be open to the public."  N.H. Rev. Stat. Ann. § 91-A:2, II. "The purpose of the Right-to-Know Law is to ensure both the greatest possible public access to the actions, discussions and records of all public bodies, and their accountability to the people."  Lambert v. Belknap County Convention, 157 N.H. 375, 378, 949 A.2d 709, 714 (N.H. 2008)(citation omitted).

The record in this case reveals that the ZBA engaged in extensive public discussion and deliberation prior to its September 27, 2007 decision to deny ITW's application. Specifically, during its September 27, 2007 meeting, the ZBA discussed and voted on each criteria for ITW's variance application.  (CR 203-16.)  The minutes of that meeting reflect that the ZBA determined that all but two of criteria necessary for a variance had been satisfied.  (Id.)  Although my March 25,

-31-

2009 Order concluded that the ZBA had failed to comply with the TCA's written decision requirement, I did not require the ZBA to redo its deliberations and vote again on ITW's application. Rather, my Order merely remanded the matter to give the ZBA an opportunity to issue a separate written decision consistent with its earlier ruling.

Following the March 25, 2009 Order, the ZBA convened on March 26, 2009 for a previously scheduled public meeting.  (March 26, 2009 Meeting Minutes, Doc. No. 33-3.)  At that meeting, Chairman John Daly notified the other ZBA members that the court had granted the Town thirty days to draft a written decision memorializing the ZBA's denial of ITW's application.  The meeting minutes state that ZBA member Ciardelli would be assigned to draft a decision with the ZBA's counsel, Peter Loughlin.  The minutes also note that the ZBA would hold a public hearing to consider the proposed decision.  (Id.)

On April 23, 2009, the ZBA met again in a "working meeting" to consider whether to accept and issue the draft written decision.  (April 23, 2009 Meeting Minutes, Doc. No. 33-4).  Although the April 23, 2009 minutes state that no members of the public were in attendance, the meeting was open to the public and minutes were kept for the public record.  Further, although the April 23, 2009 minutes do not describe any detailed discussion or deliberation, they state that the ZBA members were given an

-32-

opportunity to discuss the matter before a vote was taken to approve the decision.  After a brief comment by one ZBA member but no further discussion, the ZBA voted to issue the written decision.

There is no evidence to support ITW's assertion that the ZBA at any time engaged in private discussions or deliberations regarding its denial of ITW's application.  The only private meeting referred to in the record is Ciardelli's meeting with the ZBA's counsel to draft the written decision.  Ciardelli, however, was entitled to meet in private with counsel to obtain advice as to how to draft a written decision that reflected the ZBA's prior ruling because "[c]onsultation with legal counsel" does not constitute a "meeting" which is required to be open to the public for purposes of the New Hampshire Right-to-Know law.  N.H. Rev. Stat. Ann. § 91-A:2, I(b).

While ITW contends that other private discussion and deliberations must have occurred because the ZBA did not engage in any discussions at the April 23, 2009 meeting before voting to adopt the proposed written decision, ITW's argument overlooks the fact that the ZBA had engaged in extensive public deliberations before denying ITW's application in 2007.  Under these circumstances, it is not surprising that the ZBA approved the April 23, 2009 decision with little additional discussion.

-33-

In sum, there is no basis in the record for ITW's Right-to-Know Law challenge because the only meetings the ZBA held concerning ITW's variance request were the public meeting held in 2007 where the ZBA denied the requested variance, the public meeting on March 25, 2009, where Ciardelli was assigned to draft a written decision with the assistance of counsel, and the public meeting on April 23, 2009, where the written decision was approved.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, I deny ITW's motion for summary judgment (Doc. No. 9) and grant the Town and Kenridge Farm's motion for summary judgment (Doc. Nos. 14 and 17) as to Count I.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

August 28, 2009

cc:  Steven E. Grill, Esq.
     Russell Hilliard, Esq.
     Jeffrey Spear, Esq.